## Case No. 14,820.

### UNITED STATES v. COBB.

[4 Am. Law J. (N. S.) 145; 8 Leg. Int. 150.]

District Court, N. D. New York. Oct. 20. 1857.

CRIMINAL LAW—PRELIMINARY EXAMINATION—EVIDENCE—RESISTING FUGITIVE SLAVE LAW.

[1. On preliminary examination. prima facie evidence of guilt is sufficient to hold to bail. until the offence may be examined by a grand jury.]

[2. Where a fugitive slave is arrested and lawfully restrained of his liberty under the provisions of the act of Sept. 18, 1850. all interference by third parties by word or act. for the purpose of favoring his escape. and tending to that result. is a violation of the act. rendering the offender amenable to its penalties.]

[This was an indictment against Ira H. Cobb. Moses Summers. James Davis, Stephen Porter, William L. Salmon, Harrison Allen, William Thompson, and Prince Jackson, for aiding in the escape of a fugitive from labor.]

CONKLING, District Judge. The specific charge on which the prisoners have severally been arrested and brought before me for examination, is that of having unlawfully aided in the escape of an alleged fugitive from labor. after he had been apprehended, and while he was yet in custody, in virtue of a warrant issued in a proceeding for his restoration to the person. a citizen of Missouri, to whom it was alleged his labor was due. In proceeding, now, as it is my duty to do, to decide upon the legal effect of the evidence before me, it is proper to premise that there is no testimony tending to fix upon the defendants the guilt of any higher offence than that just named. This, indeed, I understand to be tacitly conceded by the attorney for the United States. There is no evidence of previous combination and arming for the purpose of "levying war against the United States;" nor does it appear that the defendants and their associates had any object in view beyond that of defeating the execution of the law in a particular instance. These are therefore to be considered and treated as cases arising under the seventh section of the act of September 18, 1850 (chapter 60) entitled "An act to amend, and supplementary to, the act entitled 'An act respecting fugitives from justice, and persons escaping from the service of their masters,' approved February twelfth, one thousand seven hundred and ninety-three." The section referred to is in the following words: "And be it further enacted, that any person who shall knowingly and willingly obstruct. hinder or prevent such claimant, his agent or attorney, or any person or persons lawfully assisting him, her, or them, from arresting such fugitives from service or labor, either with or without process as aforesaid, or shall rescue, or attempt to rescue, such fugitive from service or labor from the custody of such claimant, his or her agent or attorney, or other person or persons lawfully assisting as aforesaid, when so arrested, pursuant to the authority herein given and declared; or shall aid, abet, or assist such person so owing service or labor as aforesaid, directly or indirectly to escape from such claimant, his agent or attorney, or other person or persons legally authorized as aforesaid; or shall harbor or conceal such fugitive, so as to prevent the discovery and arrest of such person, after notice or knowledge of the fact that such person was a fugitive from service or labor as aforesaid, shall, for either of said offences, be subject to a fine not exceeding one thousand dollars, and imprisonment not exceeding six months, by indictment and conviction before the district court of the United States for the district in which such offence may have been committed. or before the proper court of criminal jurisdiction, if committed within any one of the organized territories of the United States; and shall moreover forfeit and pay, by way of civil damages to the party injured by such illegal conduct, the sum of one thousand dollars for each fugitive so lost as aforesaid, to be recovered by action of debt, in any of the district or territorial courts aforesaid, within whose jurisdiction the said offence may have been committed."

The accusation is that the defendants, in direct contravention of the act, did, on the first of October instant, at the city of Syracuse, "aid, abet, or assist" the fugitive to escape from the custody of Mr. Allen, the deputy marshal. by whom he had been apprehended. The defendants are not now on trial for the purpose of ultimately determining whether they are to be subjected to punishment. This is but a preliminary inquiry to ascertain whether they ought to be held to bail, or in default thereof to be committed to prison. for the purpose of securing their presence at the next stated session of the district court, to answer further in the event

of their being indicted by a grand jury; and it is a settled principle of law that for this purpose, prima facie evidence of guilt is sufficient. At the close of the examination on Saturday afternoon, although I then saw no ground for serious doubt concerning my duty in the premises with respect to either of the defendants, I deemed it proper nevertheless to hold the case under advisement until this morning. A careful consideration of the evidence has confirmed my original impression of its entire sufficiency to establish the guilt of each of the defendants for the purposes at least of this inquiry. Indeed, with the exception, at most, of Stephen Porter, their culpability appears to be placed beyond a reasonable doubt. The only witness against him is Page Newton, an intelligent and apparently honest and trustworthy man, of whose evidence it can at most only be said that the cry which it imputes to Porter, may possibly have been uttered by another; while on the other hand it appears very highly probable, from Porter's previous language and conduct, not only that the witness is not mistaken in this particular, but that Porter's interference was not limited to a single cry designed to urge on the more active assailants.

The proceedings on the part both of the commissioner and of the deputy marshal, appear to have been entirely regular. The fugitive was therefore lawfully restrained of his liberty by due process of law, and all interference by third persons, by act or words, for the purpose of favoring his escape, and tending to that result, is a violation of the act rendering the offender amenable to its penalties. The interposition of the defendants and their numerous coadjutors who have not been identified, was direct, palpable and unequivocal; its motive, if not in every instance openly avowed, was too obvious to admit of doubt: it was adapted to the unlawful end in view, and terminated in its accomplishment. My duty towards the defendants is therefore plain and imperative. They must severally be required to give bail for their appearance at the next term of the court to be held at Buffalo, on the second Tuesday of November, or, for want of sufficient bail, be committed to prison.

It is unnecessary to say more, and under ordinary circumstances, it might be impertinent to do so; and yet I would fain avail myself of the occasion, further to discourage, so far as my voice may be potential for this purpose, the repetition, in this district, at least, of the disgraceful scenes of lawless violence and outrage described by the witnesses in these cases. They must have been the fruit either of gross delusion or of wanton contempt of law and social order. For the purpose of effecting the liberation of a person from custody under process issued and executed in conformity with express and well known provisions of the constitution and laws of the United States, a building in the midst of a populous city was partially demolished, and deadly weapons were recklessly used, to the imminent jeopardy of human life, and to the grievous injury of several persons. The least reprehensible motive by which the aggressors can be supposed to have been animated, is the belief on their part that slavery is unjust and immoral; and that the laws by which it is upheld, may therefore be rightfully resisted by force. It must be the hope of all good men that the time may eventually come, when injustice and oppression in every form, including human slavery, if such be its character, will have been banished from the earth. But these wrongs exist, and are likely to endure, in other forms besides that of slavery; and if we have nothing better than lawless violence to rely upon for their removal, they will never cease. It is to advancing civilization alone that we can look for their gradual extinction. Wise men understand this, and shape their course accordingly. Bigots and fanatics are too blind to see it, or too impatient to heed it; and in their headlong zeal to redress particular wrongs, real or fancied, regardless of all other consequences, they commit other wrongs more aggravated and intolerable. Such is the grave error into which these defendants have fallen. Regardless of their civil and social duties, they have broken the public peace, set the law at open defiance, and with deadly weapons assaulted and wounded its officers while executing its mandates. In thus insulting the majesty of the law, did they expect to escape its vengeance? If so, their folly was equalled only by their criminality. What is the law in this country, but the declared will of the majority, to which, when thus expressed, all are bound, by a fundamental principle of the government, to submit, and which all its ministers are sworn to enforce. It often happens that laws are enacted contrary to the judgments, and sometimes to the moral sense of thousands of our citizens; and this must unavoidably continue to be the case. But no sane man imagines that he is therefore absolved from the obligation to obey them; still less that he has a right forcibly to prevent others from doing so. If he cannot submit to them consistently with the dictates of his conscience, he may seek a residence in some other country, if he can find one where he thinks he would suffer less from misrule; but so long as he continues to be an inhabitant of the United States, he must submit to the laws or pay the penalty of his disobedience. When this ceases to be true; when every man may transgress a law with impunity because he dislikes it, our government will have become a vain mockery, not worth preserving, for it will have ceased to afford protection to the rights either of property or of life.

The act in question has unhappily been fruitful of bigotry and fanaticism; and it is due to candor and truth to add, that it seems

to have bewildered the judgments and consciences of others besides the class of citizens to which the defendants belong. I am happy to be ignorant of the existence in this part of the state of New York of any of those persons—few I trust in number, anywhere to whom I allude. The manly spirit and love of fair play, prevalent here, are an effectual antidote to the unhappy delusions under which these persons seem to labor. I doubt, also, whether they are to be met with in the states where slavery is tolerated; for I have always understood that our Southern brethren, whatever may be their faults in other respects, are likewise distinguished for the virtues I have mentioned. Judging from the language of these enthusiasts, more blind than amiable, on a recent occasion, one would be led to conclude that they suppose it to be the bounden duty of those who are charged with the execution of the fugitive slave act, as often as their powers are evoked for the restoration of an alleged fugitive from labor, to take care that he shall at all events be delivered to the claimant; and to that end, to take care also, so to interpret the law, as, at all events, to ensure this result. It may not be amiss to remind these well meaning people that the law, in the application of its provisions, is no respector of persons, and that judges are bound to administer it as they find it, intelligently, firmly and impartially. The day, I trust, is far distant when the rights vouchsafed by law even to a fugitive slave, will be less secure under the guardianship of American judges than of his master.